## CRITES v. RADTKE et al.

District Court, S. D. New York.
July 6, 1939.

Percival E. Jackson, of New York City, and R. Dean Warner, of Los Angeles, Cal., for plaintiff.

Leonard Day, of New York City, for defendants Albert A. Radtke and Radtke Patents Corporation.

Robert W. Perkins, Stephen H. Philbin, and Joseph D. Karp, all of New York City, for defendants Thomas J. Martin, United Research Corporation, and Warner Brothers Pictures, Inc.

Henry Turin, of New York City, for defendant Leonard Day.

BYERS, District Judge.

The plaintiff sues in his own right, and as the alleged successor to American Development and Operating Company (which will be called Development Co.), to obtain the following relief as against the several defendants:

An injunction against the sale, assignment or transfer, etc., of a patent application filed in 1922 by the individual Radtke, and a divisional application thereunder; and that the plaintiff be decreed to be the owner thereof, and that appropriate assignments be ordered to effectuate that purpose.

The individual defendant Albert A. Radtke is the inventor who applied for that patent, and will be referred to as Radtke.

The defendant Leonard A. Day is his attorney, both in this case and in other proceedings.

Thomas J. Martin is an accountant employed by the defendant Warner Brothers Pictures Inc., and, acting in behalf thereof, took an assignment of Radtke's said application, and then assigned the same to Radtke Patents Corporation. He has no personal interest in the controversy.

Radtke Patents Corporation holds title to the application and divisional application.

United Research Corporation is a subsidiary of Warner Brothers Pictures, Inc., and licenses have been issued to both of them by Radtke Corporation.

The application was filed in the United States Patent Office by Radtke on December 27, 1922, under the title "Method of and means for optically recording and reproducing sound"; the divisional application was filed November 11, 1931; under date of March 24, 1938, the title was changed to "Method of and means for optically reproducing sound", which change was consistent with the divisional application covering the recording of sound, and the patent was granted on that date, bearing number 2,114,939.

The inference is inescapable, although there is no testimony on the subject, that the invention is deemed to be valuable in

the motion picture industry in connection with talking pictures. Otherwise the suit would not have been brought.

The theory of the plaintiff's case is that on November 28, 1916, Radtke made a contract with the Development Co. whereby he agreed to enter its employ for an indefinite period of time at a salary of $300 a month for one-half of his time, and to assign to the plaintiff (who was the superintendent of the Development Co.) all inventions, improvements, and patents resulting from Radtke's efforts to devise and make improvements in "photocell apparatus, equipment, products, methods and processes both chemical, physical, electrical and mechanical, relating to or connected with the business, products, work, and/or investigations of said Company and said Virgil C. Crites (the plaintiff) * * *."

Further, that Radtke agreed to compile and maintain a data book to contain all entries pertaining to his discoveries, inventions, etc., in a fiduciary capacity and solely for the benefit of said Development Co. and the plaintiff, which data book should be their exclusive and sole property.

Such is the contract which the plaintiff has undertaken to establish so as to demonstrate that the said patent No. 2,-114,939, which was applied for over five years after the employment in question terminated, was embraced in the said contract; and in effect, that specific performance thereof should be decreed to the plaintiff, so that he may be declared to be the patent owner as against the inventor and the several other assignees and licensees who are named as defendants.

The action, which was begun in January, 1937, obviously is an equitable one.

The testimony is voluminous, and there are a multitude of exhibits, but the issues are quite simple.

Consideration of the evidence yields the following findings of fact:

1. The said Radtke entered into a verbal contract with the said Development Co. on or about November 28, 1916, whereby for a salary of $300 per month, for one-half of his time, he undertook to devise, and if need be invent, such an electrical circuit that an electric current having its origin in a photo-electric cell would be amplified in a three-element audion amplifier so as to motivate a sort-ing device, whereby cigars which had been exposed to the beam of light actuating the photo-electric cell, would be sorted as to shade.

2. By the terms of the said contract, which apparently was subject to termination at any time, he undertook to bring to bear in behalf of his employment such skill and knowledge as he possessed at the time that the contract was made, and as he might acquire while in the employ of the said company, and to use his best endeavors to accomplish the purpose described in the foregoing finding.

3. It was part of the said contract, that Radtke should offer to the said company any inventions which might result from his experimentation, and study of the problem stated in the first finding.

4. During the course of his said employment, he did invent an electrical circuit adapted to amplify a current having its origin in a photo-electric cell excited by light reflected into it from cigars of different shades, which current was amplified in a three-element audion amplifier disposed in electrical series with the said photo-electric cell, and he believed that invention to be a patentable one.

5. The invention described in the foregoing finding was embodied in an application made by said Radtke to the United States Patent Office under date of June 20, 1917, consisting of a petition, specifications and claims, attached to which is a patent drawing said to depict the said invention, which application bore the serial number 176,290, assigned to it by the United States Patent Office.

On June 20, 1917, Radtke assigned the said application to the plaintiff in this action, having first offered it to the said Development Co. which accepted it, and caused to be issued a certificate for ten shares of the capital stock of the Development Co. to Radtke in consideration of the said assignment of the said patent application to the plaintiff.

6. The solicitation and prosecution of the said patent application thereafter pertained to the plaintiff as superintendent of the said Development Co.

7. Radtke's employment by the said company was terminated by the latter during the month of November, 1917, because of the then precarious financial condition of the company.

8. Neither at the termination of his employment by the said Development Co., nor at any time prior or subsequent thereto, did Radtke represent to the plaintiff or to the officers of the said Development Co. that he had not conceived independently or otherwise any invention such as that embodied in his application for the patent which the plaintiff seeks to acquire in this cause; nor did he represent directly or indirectly, that he had not conceived any improvement relating to the amplification of current variations in a photo-electric cell produced by changes of light, except that referred to in finding 5, and no such representations were sought from him by the plaintiff or the said Development Co.

9. The invention embodied in the said application filed by Radtke in the United States Patent Office on December 27, 1922, heretofore referred to in that which precedes these findings, was never the property of the plaintiff or of said Development Co., nor is it now the property of the plaintiff.

### Conclusion of Law.

For failure of proof, the plaintiff's amended bill of complaint must be dismissed on the merits, with one bill of costs to the defendants.

It may be appropriate to supplement the foregoing by a brief discussion of the evidence.

In 1916, the plaintiff, being twenty-one years of age and lacking technical education, and having been engaged successively in the furniture, carburetor, and insurance businesses, became the superintendent of the American Development and Operating Company of which his father was president.

That company was chartered in May of 1916, with an authorized capital stock of $100,000, consisting of a thousand shares of the par value of $100 each, to manufacture and place upon the market a cigar sorting machine.

Apparently the idea of constructing such a device, to function as the result of actuating the beam of a photo-electric cell by the shade variations of cigars, had its origin with the plaintiff. At least, for present purposes, that is assumed.

He convinced his father that the conception was valuable, and could be developed commercially, and so a Delaware corporation was organized, and some stock apparently was sold, but not in the state of Illinois, although the office and workshop were in Chicago.

The arrangement between the plaintiff and the company was, that he was to have 55% of the capital stock, presumably because the idea was thought to be his as has been stated, plus 10% of the company's profits arising from royalties, rents, etc., of the cigar sorting machines.

Apparently it was recognized that the concept of the plaintiff could not be embodied in an operative structure unless requisite inventions were to be made by employees of the company, and accordingly it was ordained that all such inventions should be assigned to him.

The necessity for this arrangement arose from the incomplete nature of the concept itself, because an electric current having its origin in the photo-electric cell is too feeble to set in motion the mechanical functions of a cigar sorter, and the desired result could not be accomplished unless the current could first be amplified.

The initial task of the new enterprise therefore was to perfect association of the photo-electric cell with an adequate medium of amplification, and then to cause the current, as amplified, to operate the sorter.

Since the plaintiff was lacking the necessary insight and understanding to equip him to deal with the problem, it was required that technical knowledge be secured on terms which would be most favorable to the company and its majority stockholder.

The foregoing roughly portrays the start of the Development Co., and the basis upon which it was expected to operate.

Early efforts to secure competent technical aid resulted in the employment of Carlson, a draftsman, and Peterson who possessed some skill and experience in the handling of electrical devices; it is significant that the company entered into written contracts with them, whereby they agreed to convey any and all inventions that they might make in the course of their employment, to the plaintiff as general manager of the company.

Soon it became necessary, however, to employ a man of real competence in the field of electrical research and, as the result of an introduction by one of the directors of the company, the defendant

Albert A. Radtke, formerly a professor in scientific schools and later head of the Electrical Engineering Department in the Armour Institute of Technology, Chicago, who was then a practicing electrical engineer in that city, was interviewed and the necessities of the company were explained to him with a view to his possible hiring.

Radtke affirmatively sought this employment and expressed confidence in his capacity to succeed in solving the electrical aspect of the problem presented.

It was made known to Radtke that Professor Kunz, who had been consulted by the plaintiff, was of the opinion that the direct electric current originating in the photo-electric cell could not be amplified by the three-element audion tube, which could amplify only alternating current, and Radtke dissented from that view.

This is an important aspect of the case, because the plaintiff's testimony on this subject, as given in 1939, is to the general effect that on November 28, 1916, Radtke stated frankly that he was deficient in an understanding of the functions or principles of either the photo-electric cell or the audion amplifier. It is argued that this recital should be accepted, and that therefore Radtke's testimony must be rejected concerning the extent to which he had already conceived what was later embodied in his said 1922 application.

It must be apparent that, if the plaintiff's testimony is to be accepted concerning Radtke's then proclaimed ignorance of the very subjects which were essential to his qualifications for employment, it follows that the plaintiff and the officers and directors of the Development Co. deliberately retained a man who stated that he was not qualified to solve the only problem which the company presented to him!

The case as a whole presents no reason for attributing persuasive qualities to the plaintiff's narrative of this aspect of the evidence.

Radtke promptly entered into the duties of his engagement and, with the cooperation of Carlson and Peterson and in the presence of the plaintiff, conducted a series of experiments at the premises of the Development Co., and he did record those experiments in a data book or books, which have been received in evidence.

One of them contains a drawing known as Exhibit 35, portraying a circuit devised by Radtke, which he believed to be novel, and which he demonstrated to be effective for the purpose of sorting cigars as indicated in finding 4, and he offered this invention to the company, namely, to the plaintiff's father, as president, and it was accepted by the company, and Radtke was given ten shares of stock on the date that he executed an assignment of his application for a patent embodying that circuit, to the plaintiff.

It is unnecessary to comment upon the extent to which that association of electrical devices may have been employed by the company, because there is no evidence on the subject.

The plaintiff's case apparently goes beyond his pleading, and depends for its success upon the demonstration of a contract between Radtke and the Development Co., to the broad and general effect that any product of his brain involving the amplification of the current originating in a photo-electric cell, and whether or not it had to do with the operation of a cigar sorting machine, automatically became the property of the Development Co.

Concededly the contract was never reduced to writing, nor is there any written record of its terms.

As his first witness, the plaintiff called Radtke, who was subjected to many days of searching and often hostile cross examination under the guise of direct examination.

The plaintiff also testified in his own behalf, as did his brother, who was for a time the secretary of the company. No other witness was called to prove the terms of the contract.

The plaintiff's undertaking was ambitious and all the testimony has been examined with care with a view to determining whether, by any fair process of reasoning, it can be said that the plaintiff has sustained his burden of proof.

According to the plaintiff's brief, his case depends upon the extent to which the Court can be expected to subscribe to the efficacy of denunciation.

Radtke is said to have deliberately perjured himself a number of times; to have fabricated the Leich drawing dated November 20, 1916, disclosing a circuit such as is embodied in the patent which the

plaintiff desires to capture; to have inserted a high resistance in the circuit of the Carlson drawing which is a later portrayal (January 20, 1917) of the same thing, after showing plaintiff that drawing without the high resistance; to have suborned perjury by the witness Phillips who is an elderly lady now, but who was in his employ in November, 1916; and generally to have wickedly withheld from the plaintiff knowledge that he had caused the Carlson drawing, as it now appears, to be made, and that he had actually caused the circuit therein shown to function during the month of January, 1917, in the workshop of the Development Co.

Granting the possibility that all of such things could be true, the fact is that the plaintiff has failed to prove any part of them.

So far as the resistance in the Carlson drawing is concerned, I doubt if the plaintiff would have recognized it, or understood what it signified, in January of 1917.

The rest of the defendants are roundly denounced as conspirators and as being generally unworthy.

I have found nothing in the evidence to justify such characterizations.

The essential equities of the case are not with the plaintiff. There is nothing in the history of the Development Co., or in its known requirements during the years 1916, and 1917, which would justify the belief that it sought to accomplish anything in addition to means electrically to sort cigars according to shade. There was no reason why that company or the plaintiff in 1917 should have conceived of the possibility that the conversion of a fluctuating beam of light into an electric current could be adapted to any general employment beyond the requirements of its cigar sorting machine.

This means that there was nothing in the relation of the parties, when Radtke was hired, to suggest that he was supposed to have contracted to deliver to the Development Co. or its general manager anything beyond that which he might devise in order to perfect the operation of the machine which that company was trying to put upon the market. As between Radtke's testimony to the effect that he promised to submit any invention in that field only, to the company for its acceptance or rejection, and the plaintiff's testimony that the contract contemplated

that there should be an automatic transfer of all germane intellectual product on the part of Radtke to the company, for $300.00 per month, terminable at any time by it, there is no difficulty of choice, in selecting the former.

Had such a contract as the plaintiff describes been contemplated, the plainest dictates of corporate prudence would have required that it be stated in writing. Such indeed was the arrangement with Carlson and Peterson, whose contracts were written.

The only corporate record available touching Radtke's employment is the copy of an annual report to the stockholders of the Development Co. issued at the close of 1916, which reads in part as follows:

"Under the direction of Virgil C. Crites as General Manager assisted (by?) Prof. A. A. Radtke expert Electrical Engineer, A. W. Carlson Machine Designer, Oscar T. Peterson Master Mechanic and others, the work of development has progressed to a point where these men express the opinion that the successful building of an Automatic Shading Machine within a reasonable time is now assured."

Had Radtke been under such a contract as the plaintiff now asserts, that report would have been a convenient medium for so proclaiming, and what is more important, it would have been evidenced by a written instrument, for two of the directors of the company were lawyers.

It is not entirely clear whether the plaintiff asserts that Radtke knew and understood the value of a device which would record sound frequencies, and then amplify them for reproduction, at the time that he made the contract with the Development Co., and deliberately concealed that knowledge; or whether he discovered or came to realize the possibilities of such a device while he was in the employ of the Development Co. and kept the knowledge to himself.

Probably this lack of clarity of contention is unimportant since, in the view presently held, Radtke's employment was for a single and well-defined purpose and his engagement should be measured by that purpose; thus it could not be concluded that, at the time he assigned the patent application to the plaintiff as has been related, he wilfully concealed a discovery, invention, or other intellectual product, which he had contracted to impart to his employer; and whether his mental concept

of the patent which the plaintiff seeks came to him in November of 1916, or January of 1917, is of no consequence to the issues of this case.

The two drawings to which reference has been made are known as the Leich drawing said to have been made on November 20, 1916, eight days before Radtke entered into the employment of the Development Co., and the Carlson drawing, which was completed about January 20, 1917. They embody the same circuit, and that is the circuit of the patent in suit. They disclose a high resistance to impart a negative potential to the grid of the amplifier tube necessary for sound reproduction as in 1917, but not for photometry, the function of which was necessary to make the cigar sorter operate.

It must be borne in mind that in 1917 the audion amplifier was not the perfected instrumentality that it has since come to be.

The data book contains a sketch (Exhibit 35) of the circuit of the application which was assigned to plaintiff by Radtke on June 20, 1917, designed to meet the needs of the cigar sorting machine.

As to that, it should be observed that it was never put in form for allowance, and the responsibility for abandonment must be placed at the door of the plaintiff.

Stated in lowest terms, plaintiff asserts that he was just as much entitled to acquire from Radtke the circuit of the Carlson drawing, as he was the one which *was* assigned to him, because Radtke was not free to conceive of any circuit to amplify a photo-electric cell current, for any purpose whatever, as an electrical engineer, having bound himself to the contrary.

That contention is not sustained by the evidence, or any fair inference to be drawn from it.

Probably during the month of January, 1917, Radtke had reached an understanding that current variations having their origin in a registration of voice frequencies, when depicted upon a film, could be amplified, which was also true of current variations which were similarly registered as the result of the exhibition to a light ray, of color and shade variations. As to the latter, it was Radtke's job to see that such variations could be manifested in a device which would automatically sort cigars according to shade; it was not his job to make known to his employer a possible belief that the amplification of the current variation could be put to some use unrelated to the requirements of a cigar sorting machine.

It is a reasonable inference, based upon an understanding of the objects and purposes of those in control of the Development Co., that even if Radtke had exposed to them such insight as he then possessed concerning the problems incident to the recordation and amplification of voice frequencies, they would probably have told him that they were not interested in that subject, but were solely engaged in arranging for the manufacture and disposition of cigar sorting machines, and in selling stock to promote that enterprise.

It is equally probable that, if the cigar sorting machine had developed into a profitable venture, or if the patent in suit had not been deemed of value in the field of motion pictures, this bill in equity would never have been filed.

That is the view which is presently held, and sufficiently disposes of the entire suggestion that Radtke was required either by the terms of his contract of employment or by considerations of good faith implicit therein, to make or offer to make such donation to the Development Co. as the plaintiff now claims as the successor to the company through a purchase, in an insolvency proceeding, of its inventions and rights thereto.

On the technical side of the case, it is testified for the defense that, as of 1917 and probably as of 1922, there was a manifest difference in the respective circuits of Exhibit 35 and that of the patent in suit; that would seem to be consistent with the different results that followed the solicitation of the two applications.

That expert testimony, which has not been refuted, is to the effect that a circuit used in sound reproduction would not function acceptably for photometric activity (such as was required in a cigar sorter). Thus the witness Tasker:

"Any circuit designed for photometry must be capable of accurately and steadily indicating in the output of the vacuum tube amplifier—I am assuming amplification—whatever light is impressed on a photo-electric cell, whereas in the case of sound, alternations only are required, and in consequence circuits better adapted to

sound reproductions are and were available, but they were not satisfactory for photometry."

It is thus fair to conclude that, when Radtke assigned to the plaintiff the application of June 20, 1917, having offered it to the Development Co. in accordance with the contract of his employment, he fully performed the obligations of his contract of employment, and there is nothing in the case to demonstrate that if that application had been persistently solicited to completion, the Development Co. would not have been in possession of a device adequate for its purposes.

Nothing in Radtke's employment forbade him to pursue investigations which might well have seemed important to him as early as November 20, 1916, or which were suggested to him during the period of his employment by the Development Co., which had to do with activities lying beyond the known requirements of that company.

There is nothing to suggest that he contracted to submit to the company anything but the results of his experimentation and possible discoveries which would tend to enhance and develop the business of the company.

The concept embodied in the patent now sought to be obtained by the plaintiff was so foreign to the requirements of the Development Co. that no considerations, either legal or moral, entitle the plaintiff presently to any rights thereunder.

Necessarily much of the evidence has not been referred to in this opinion. It is believed, however, that the essence of the plaintiff's case has been laid bare, and that his fundamental contention is so lacking in merit that no good purpose would be served by prolonging the present discussion.

The few cases upon which the plaintiff relies have been examined in vain for any teaching which would justify awarding to him the extraordinary relief that he seeks.

It is not deemed necessary to discuss or decide whether the plaintiff acquired, from the receiver of the Development Co., the highly intangible and tenuous property or contract right which he here asserts! That has been assumed for the sake of argument, but the question has not been decided. Nor has the question of laches been determined. The dismissal of the amended bill might well rest upon the plaintiff's delay of nearly three years, after he is shown to have known of the Radtke application which has ripened into the patent in suit, before filing his bill, but because of the views held upon the essential merits of the cause, there will be no finding or conclusion presently made on that subject.

Settle decree in accordance with the findings as stated and, if additional findings are desired, they may be submitted for consideration, with notice of settlement.